**SIGNED this 29th day of May, 2008.**

_____
**FRANK R. MONROE
UNITED STATES BANKRUPTCY JUDGE**
_____

```
               UNITED STATES BANKRUPTCY COURT
                 WESTERN DISTRICT OF TEXAS
                      AUSTIN DIVISION
IN RE:                              )
                                    )
MARTNKIM DINING, LLC dba            ) CASE NO. 07-10981-FM
DOS RIOS RESTAURANT,                ) (Chapter 11)
                DEBTOR              )
_____)
MARTNKIM DINING, LLC,               )
                PLAINTIFF           )
VS.                                 ) ADVERSARY NO. 07-1082-FM
                                    )
DAVID CHANEY and JANALYN CHANEY     )
                DEFENDANTS          )
```

MEMORANDUM OPINION

The Court held a three-day trial of the above entitled and numbered adversary proceeding commencing April 22, 2008. This Memorandum Opinion constitutes written Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052. This Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §1334(a) and (b), 28 U.S.C. §157(a) & (b)(1), 28 U.S.C. §151 and

1

the Standing Order of Reference for Bankruptcy Matters from the United States District Court for the Western District of Texas, Austin Division.

This is a core proceeding under 28 U.S.C. §157(a), (b)(2) & (c).

**Facts**

Plaintiff is a corporation wholly owned by Kim and Marty Clements (the "Clements") which was formed for the sole purpose of purchasing from Defendants David and Janalyn Chaney (the "Chaneys") a Mexican food restaurant in Kingsland, Texas known as the Dos Rios Restaurant pursuant to an Earnest Money Contract entered into between them on or about June 6, 2006. Closing of the sale under the Contract was to be no later than July 5, 2006. The sales price was $465,000.00 for five lots of real estate, the improvements upon three of the lots and the restaurant business. Ninety-three thousand dollars, $93,000.00, was payable at closing with the Defendants financing the balance of $372,000.00. The Contract had an "as is" provision in which buyer agreed to accept the property in its present condition. The Contract also provided a seven-day feasibility period for the Clements to conduct their due diligence.

In the Special Provisions portion of the Contract at Paragraph 12, Defendants were required to furnish to the Clements financial information set forth on Exhibit "B". Some of the information was furnished, some was not. Only two items on Exhibit "B" were the

subject of the evidence placed into the record, and, therefore, the dispute submitted to the Court. They related to verification by the Clements of the revenue and expense numbers contained in the profit and loss statements for the years 2003, 2004, and 2005 (the "P&L's") that had been provided to the Clements by the Defendants through their real estate agent, Debbie Seward.

Another special provision, which was put into the Earnest Money Contract at the specific request and instruction of the Clements, was the apportionment of the sales price as follows:

    Real Estate – $220,000.00

    Equipment & Furnishings – $200,000.00

    Good Will and Name – $35,000.00

    Inventory of Food Items – $10,000.00

The evidence clearly showed that this apportionment bore absolutely no relation to reality and, therefore, was obviously done by the Clements for their own purposes, probably tax driven. Therefore, the extent to which these numbers vary from what the true value of those apportioned items were as of the date of closing cannot per se form the basis of any relief to the Clements in this case.

The P&L's are in evidence as Plaintiff's Exhibits 14, 15, and 16, and Defendants' Exhibits 3, 2, and 1 respectively. From the Plaintiff's Exhibits it appears that the P&L's were received by the Clements on April 13, 2006 at 4:04 p.m. The total income from sales [including cash sales] reflected on the P&L's are $445,570.00

3

for 2003, $456,435.00 for 2004, and $417,300.00 for 2005. Net income was shown to be $86,714.58 for 2003, $95,470.00 for 2004, and $101,435.11 for 2005.

Mr. Clements obtained his undergraduate degree from what is now Texas State University in San Marcos, Texas in Management Information Systems. He had 12-15 hours of accounting courses. He operated his own pool and spa business for five plus years. For nine years he was involved with sales in an executive position with Industrial Supply Company. And, from some time in 2000 until November 2007, he was a business process engineer with Dell Computers.

After obtaining the P&L's, walking the property and discussing the nature of the business with the realtor, Ms. Seward, who had some knowledge of restaurant operation in general through prior participation in a family owned restaurant, Mr. Clements prepared his own spreadsheet which outlined what he thought the expenses would run him in the future operations of Dos Rios were he to buy it. See Plaintiff's Exhibit 32. He testified that the payroll on the P&L's seemed very low and, upon inquiry, he was told that the payroll number on the P&L's did not reflect payment to the cook and one other full time employee who were paid in cash. Some of the other expenses in the P&L's, such as cost of goods sold, contained personal expenses of the Chaneys that were run through the business.

It is evident from Mr. Clements' testimony and Plaintiff's Exhibit 32 that Mr. Clements placed no reliance upon the expenses set forth on the P&L's. This could not be clearer because he changed virtually every number in every expense category on his spreadsheet. The most dramatic was that he increased the payroll number by a multiple of four – from $26,530.70 on the 2005 P&L to his projected "future" of $104,250.00.

The only thing that stayed the same was the sales which he set at $417,000.00, the same as the 2005 P&L.

Perhaps more instructive is that he reduced cost of goods sold from $165,357.19 to $137,610.00 although it is unclear his basis for doing so since he admittedly had no experience in the restaurant business upon which to make such an adjustment.

It was apparently pursuant to this initial investigation, his analysis of the P&L's, and the creation of the "future" pro forma that Clements e-mailed the realtor, Debbie Seward, on May 16, 2006 and stated that he thought the price was fair "as long as we can substantiate the revenue expenses as they were stated." See Exhibit P-5.

Such e-mail also made it clear that the purchasers under the contract would be Kim and Marty Clements or "assigns". Indeed, this is what the Earnest Money Contract provided. This fact was made well known to the Chaneys prior the contract being signed. The assignment from the Clements to the Plaintiff occurred when the

5

sale was closed since the Chaneys transferred title directly to the Plaintiff, the wholly owned corporation of the Clements.

Now let's establish some facts about the Chaneys. They had purchased the real estate in 2000 for $160,000.00. The building that housed the restaurant was erected for $225,000.00, approximately $90 per foot. Paving cost another $45,000.00. Furniture, fixtures and equipment cost $100,000.00. The sign cost $14,000.00. The grease trap with appropriate pumps cost $8,000.00. Two propane tanks cost $1,600.00. The cost of the fence was $1,000.00. Two carports, one at the edge of the back of the property for employee parking and one immediately behind the back door for "covered" storage were $6,000.00. The total investment in the property was, therefore, roughly $564,600.00.

The Chaneys operated the restaurant for approximately 5-1/2 years. It was put on the market the fall of 2005.

The Chaneys had a rather inventive way of both operating and accounting for their operations. The Chaneys operated Dos Rios through their wholly owned corporation, Llano County Bar-B-Q, Inc.

On a historical basis, the cash sales ran approximately 2/3 of total sales. Cash sales, however, were not deposited into the corporate operating account but were instead deposited into the Chaneys' personal bank account. This included all sales taxes collected on those cash sales as well. The Chaneys' would then "loan" to the corporation its own money as needed. All cash sales

were, therefore, kept off the books of the corporation. Only credit card and check sales were input by the Chaneys into the Quick Books sales accounts maintained on behalf of the corporation. At the end of every year, Mr. Chaney would call his accountant and orally give him the amount of cash sales for the year. Mr. Chaney testified that he added up the daily cash register "cash receipts" at the end of each day and kept those receipts which, when totaled together for the year, gave him the cash sales amount which he phoned to the accountant for purposes of preparing the corporate 1120 tax returns each year.

There can only be one rational explanation for this procedure. The Chaneys did not want to, and did not, pay the sales taxes they collected on cash sales to the State of Texas. This is, most likely, a considerable sum of money.

Cash sales for 2003 through 2005 can be easily computed by comparing the annual P&L's [the sales amounts include cash sales] with the monthly P&L's [the sales numbers are credit card and check sales only]. Exhibit P-17 is a breakdown by month for the Chaneys' operations in January though November for the years 2004 and 2005. In Exhibit P-34, Mr. Clements extrapolates those numbers to a full year and determines what he describes as the "sales discrepancy" [on page 2 of such Exhibit]. This "discrepancy" is what Mr. Chaney testified were the cash sales of the restaurant which went unreported on the corporation's Quick Books revenue account. And,

of course, they were never reported to the State of Texas either.[1] The Clements maintain that that figure does not contain sales taxes. However, there is no evidence the Chaneys did not collect sales taxes on their cash sales – only that they neither reported those cash sales to the State nor paid the sales taxes to the State. The cash sales amount almost certainly includes the 6-1/4% sales tax that the Chaneys would have collected from their customers on each cash sale.

For 2004, the amount of cash sales was $312,000.00 and change. For 2005, it was $277,000.00 and change. So, roughly speaking, for the year 2004 it appears that the Chaneys collected $19,500.00 in sales taxes on cash sales ($312,000.00 x .0625), which was trust fund money belonging to the State of Texas and which they simply pocketed. For the year 2005, the number is approximately $18,000.00 ($277,000.00 x .0625). The Court has no reason not to believe that for each year that the Chaneys operated Dos Rios Restaurant through their corporate entity, Llano County Bar-B-Q, Inc., this is what happened. If this is true, then for the 5-1/2 years the Chaneys operated the restaurant, they would have converted approximately $100,000.00 of sales tax trust funds

---

[1] Mrs. Chaney testifies under oath to this fact. See transcript, p.509 at ll, 12-14. This means that all the sales tax returns filed by the Chaneys for Llano County Bar-B-Q, Inc. were knowingly false and fraudulent.

8

belonging to the State of Texas to their own personal use.[2]

But the Chaneys' malfeasance was not limited to the State of Texas. There were two full-time employees, one being Bonita Rubio, the full-time cook at the restaurant who, although being a full-time "employee", was treated as contract labor, paid in cash (presumably out of the cash siphoned out of the business by the Chaneys) and given a Form 1099. She was then responsible not only for paying her own taxes but both parts of the Social Security payroll tax as well. By this ploy, the Chaneys shifted the burden of the employer's share of the Social Security payroll tax to Ms. Rubio and did not, therefore, pay it as was their legal obligation to do so. This was also the case with one other full-time employee. This is one reason why the payroll expenses for the corporation as reflected in the P&L's were so low. They were simply not put into the books because they were paid in cash. Another reason they are low as compared to the Clements operational results is that the Chaneys had only 5-7 employees, most being part-time, and Mr. Clements testified they have 15-17 employees.

The Chaneys had also operated Rocky Top Restaurant in Granite Shoals, Texas from 1996 though 1999. One wonders if the same modus operandi was used by the Chaneys at that time.

There are several disputes regarding what was said and what

---

[2] This could constitute a felony of the second degree under Section 151.7032(4) of the Tax Code of the State of Texas.

was represented by one party to the other prior to the closing of the sale and the effect thereof. It is without dispute, however, that the sales figures on the P&L's were representations knowingly made by the Chaneys with the intent that the Clements rely upon them; and they did. The question is whether or not those sales figures were materially false, and, if so, knowingly made.

It is just as obvious that the expense portion of the P&L's were not relied on by the Clements. They were inaccurate in several material parts. Obviously, the payroll numbers bore no relation to reality. Additionally, sales taxes are not even shown as an expense item on the P&L's. Charges by the credit card companies are also wholly inaccurate as is established by looking at Exhibit P-38. Although proposed as annual amounts on the P&L's, the 2003 P&L only included 2 months of these charges, the 2004 P&L only included 4 months of these charges, and the 2005 P&L only included 3 months of these charges. However, since there was no actual reliance by the Clements on the expense portions of the P&L's, the accuracy or inaccuracy of those expense numbers are not at issue.

Other alleged misrepresentations [or failure to disclose] which the Clements have alleged to be actionable include the assertion that they never received the monthly profit and loss statements as backup to the annual statements for the years in question as required by Special Provisions contained in paragraph

12 of the Earnest Money Contract. This, however, is hotly disputed. Mr. Clements states that he was shown a handwritten recap of those monthly figures on a single yellow sheet of paper just prior to closing and that he only had time to glance at. He further stated that he found a portion of the monthly statements [Exhibit P-25 (January-July and December 2005)] in the trash can at the business the morning after the closing and that he only received Exhibit P-17 (January - November 2004 and 2005) after he sent his letter of August 2, 2006 to the Chaneys.

These monthly statements were printed from the corporation's Quick Books records and reflected only approximately 1/3 of the amount of sales that are reflected on the yearly P&L's that they had been originally given. This is because only the credit card and check sales were recorded on the corporation's Quick Books as all the cash sales were conveniently funneled into the Chaneys' personal bank account on a daily basis and never reported on the corporate books.

Mr. Clements claimed he was shocked when he saw them; but for some mysterious and inexplicable reason, he chose to not immediately confront the Chaneys even though Mr. Chaney was at the restaurant at that very time. That reaction strains the credibility of Mr. Clement's testimony on this point. If Mr. Clements had been so concerned about obtaining the monthly breakdown of the three annual P&L's he had been given originally

and that he had not gotten, one would have expected him not to close the sale but claim a default, walk away and get his earnest money back. At the very least, if he was truly concerned about receiving that information and had not received it, and if he had found it in the trash can the day after closing and, if it reflected income of 1/3 what the annual P&L's had shown, one would expect that he would have asked Mr. Chaney about the "newly found" monthly statements. In fact, one would expect that he would not be able to contain himself until he got an explanation. However, he did <u>nothing</u>.

  The Court does not believe for one minute that Mr. Clements found these documents (Exhibit P-25) in the trash the day after closing as he claims.

  Both Mr. and Mrs. Chaney, as well as the realtor, Debbie Seward, confirmed that Mr. Clements had those very monthly financials (Exhibit P-17) prior to closing. Debbie Seward testified that on the way to closing she asked Mr. Clements if he had all the financial information he wanted. She said that he told her that Mr. Chaney had put it on the desk but he had not had a chance to look at it and that he would take it on a handshake. However, both Mr. and Mrs. Chaney testified that Mr. Clements had been given this information on more than one occasion and that two separate copies were given to him prior to closing on the morning of closing. This seems more believable. Additionally, Mr.

Clements' actions of not confronting Mr. Chaney as soon as he "found" the monthly statements in the trash is, in fact, consistent with Chaneys' testimony that they had told him of the manner in which they handled and accounted for the cash sales.

Let us now go to the other alleged material representations. The Seller's Disclosure which accompanied the Earnest Money Contract reflects no problems with the property. See Plaintiff's Exhibit 22. It had been filled out and signed by the Chaneys at the time they signed the Earnest Money Contract. Debbie Seward took it directly to the Clements, explained it to them, highly encouraged them to get their own inspector of the premises, and then obtained the Clements' signature. The Clements never got an inspector to do an independent inspection of the property claiming that they were relying upon Mr. Chaney's representations that it was in great condition and they would be wasting their money by hiring an independent inspector. Mr. Chaney disputes this testimony on the part of the Clements.

In addition, the Clements claim the Chaneys made oral representations which are actionable, to-wit: (1) the land would appreciate in value and the trash would be removed, (2) the building was efficient and well built, (3) it had a great water heater, and (4) the kitchen was an efficient and pleasant environment.

13

The first problem discovered after the closing with the building was a smell emanating from the ladies' room which was remedied by David Sims around the last part of September 2006 who replaced a broken brass ring, installed a new wax ring and reseated the toilet.

Another problem was a leak at the front of the building which caused water to puddle on one of the two window sills and a leak where two walls joined in the middle of the building. Mr. Sims patched the leaks with silicone. Additionally, it is apparent that the leak in the front was because a few of the Spanish tiles on the front fascia on top of the front wall had slipped down and simply needed to be put back in place and nailed down.

The Clements also complained that the back storage area under the carport gathered water when it rained. One would expect that such would occur. It was, after all, outside. Mr. Sims' proposal to repair the rear carport at a cost of $22,206.25 is in actuality an estimate to reconstruct the carport in a manner so as to make it water tight. That, however, is not what the carport was intended to be in the first place; something which should have been obvious to the casual observer.

Mr. Sims stated that he had been in the construction business for over 30 years, he had never noticed problems with the building when the Chaneys owned it, and only became aware of these issues after the Clements purchased it.

Randy Gaas who helped construct the building originally also testified. He said the roof was properly sealed when it was installed, he had never been called to repair the roof, and was unaware of any roof leaks after it was constructed.

The Court finds that the problems with the building fall into the category of those things that tend to go wrong with a building after it has been constructed and placed in use for some five plus years. They are minor in nature. They certainly do not rise to the level of the type of defect necessary in order to sustain a fraud in a real estate transaction. Additionally, the statements made by the Chaneys that the building was efficient and well built and in good condition are not statements upon which a fraud claim can rest. They are opinions. See *The Prudential Insurance Company of American v. Jefferson Associates, Ltd. And F.B. Goldman,* 896 S.W. 2d 156 (Tex. 1995). The Texas Supreme Court held that with regard to the allegations that statements such as the building was "superb", "superfine", and "one of the finest little properties in the City of Austin", "These statements were not misrepresentations of material fact merely 'puffing' or opinion, and thus could not constitute fraud." Id. at 163.

As previously noted, the Earnest Money Contract contained an "as is" clause. Paragraph 7A states, "Buyer accepts the Property in its present condition except that Seller's expense will complete the following before closing: ...". Nothing is set forth in the

15

Contract for Seller to complete. Such agreement is valid under Texas law and enforceable so long as the sale of the property was not "fraudulently induced thereby invalidating the entire agreement." *San Antonio Properties, L.P., McCalley, and Brunette v. TSRA Investments, Inc.,* 28 Tex. App. Lexis 1766 (Tex.Civ.App. 4th 2008). The Texas Supreme Court has consistently held that, "By agreeing to purchase something 'as is', a buyer agrees to make his own appraisal of the bargain and to accept the risks that may be wrong." *The Prudential Insurance Company of America v. Jefferson Associates, Ltd. and Goldman,* 896 S.W.2d 156 (Tex. 1995). Likewise the Texas Supreme Court has held that, "A buyer is not bound by an agreement to purchase something 'as is', that he is induced to make because of a fraudulent presentation of concealment of information by the seller." Id. at 162.

Here, the evidence falls far short of establishing that there were any actionable misrepresentations by the Chaneys as to the property and its condition.

This brings us to the guts of the trial. Were the revenue numbers set forth on the annual P&L's a misrepresentation of historical sales of Dos Rios Restaurant while operated by the Chaneys for the years 2003, 2004 and 2005? Mr. Chaney testified those numbers were accurate. It is impossible to know for sure the accuracy of the cash sales portion of those numbers as the records, primarily the daily cash register cash receipt tapes, are no longer available.

The 2005 P&L showed total sales of $417,000.00. This averages out to $34,750.00 per month. Total sales revenue for the six month period in 2006 in which the Chaneys operated Dos Rios was $197,295.00. This is an average of $32,882.50 per month.

The P&L's for Clements' first months of operations as contained in Exhibit D-14 show that for July through December, the Clements' gross sales were $33,143.21, $35,768.23, $34,706.03, $34,689.80, $33,053.71, and $31,261.18 respectively.

It appears to the Court that the sales experienced by the Clements after purchasing the restaurant were effectively the same as experienced by the Chaneys before they sold the restaurant and that the representation of revenue contained in the annual P&L's originally given to the Chaneys appears not to be inaccurate.

Accordingly, the Court can only conclude that the Plaintiff has failed to sustain its burden of proof to show by a preponderance of the evidence that the revenue numbers provided to them by the Chaneys were inaccurate or that they were a misrepresentation of fact in any material respect.

Therefore, Defendant wins on the following causes of action:

1. Common Law Fraud
2. Statutory fraud under §27.01 of the Business and Commerce Code of the State of Texas
3. Negligent misrepresentation
4. Violation of the Deceptive Trade Practices Act

This leaves us with the breach of contract claim. Mr. Chaney was contractually obligated to be at the restaurant for thirty (30) days beyond the closing date to assist the Clements in an orderly transition and to acquaint them with the operations of the business. Mr. Chaney was there two days and testified that he was told during the second day by Mrs. Clements to go home. He never returned. Mr. Chaney says that the Clements did not want him there. And, in fact, the Clements never called him to come back. It is uncertain who is at fault on this part of the complaint.

The Clements claim that they are entitled to damages by reason of this breach. They state that the damages should be 1/12th of the salary Mr. Chaney paid himself when he was operating the business. The Contract itself set no damages for a breach in this regard. Mr. Chaney's salary while he operated the business seems unrelated to the issue. Plus, the restaurant made virtually the same amount of money in July after the Clements took over as it did in June while the Chaneys were running it. Because of the dispute between the parties as to whether Mr. Chaney had worn out his welcome at the Clements' newly acquired restaurant in two days and because there appear to be no damages as a result of his not being there, the Court declines to grant relief to the Plaintiffs on this last cause of action.

A take nothing judgment of even date herewith will be entered in favor of the Defendants.

###

cc: All Counsel of Record